

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| LIMETREE BAY TERMINALS, LLC d/b/a OCEAN POINT TERMINALS,<br><br>Petitioner,<br><br>v.<br><br>BENNINGTON COLLEGE,<br><br>Respondent. | No. 2:25-mc-133<br><br>Related Case No. 1:21-cv-00253-WAL-EAH in the U.S. District Court of the Virgin Islands, Division of St. Croix |

### PETITIONER LIMETREE BAY TERMINALS, LLC'S MOTION TO COMPEL RESPONDENT BENNINGTON COLLEGE'S COMPLIANCE WITH OUT-OF-DISTRICT RULE 45 SUBPOENA DUCES TECUM

Petitioner Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals ("**LBT**"), by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 45, respectfully moves the Court for entry of an Order compelling non-party Bennington College ("**Bennington**") to comply with the Subpoena Duces Tecum served on January 21, 2025, (the "**Subpoena**"), a copy of which is attached here to as Attachment 1, specifically, to provide the names and – more importantly – the addresses of participants in a survey conducted by Bennington, in connection with the related case referenced above (the "**Related Action**").[1] In support of this Motion, LBT respectfully shows the Court as follows:

### INTRODUCTION

The Subpoena was issued in connection with a consolidated class action suit brought against LBT and other defendants following four alleged emission events (the "**Incidents**") that

---

[1] The Related Action is identified as <u>Boynes et al. v. Limetree Bay Ventures, LLC et al.</u>, 1:21-cv-00253-WAL-EAH, pending in the U.S. District Court of the Virgin Islands, Division of St. Croix.

occurred during the restart of the Limetree Bay Refinery ("**Refinery**") in St. Croix, U.S. Virgin Islands between February 2021 and May 2021. Two of the incidents involve reports of oil emissions from a flare at the Refinery, and two others involve reports of hydrogen sulfide and sulfur dioxide emissions from the Refinery.

Following the Incidents, a Bennington professor conducted a "Community Impact Survey" (the "**Survey**") of St. Croix residents about the impacts of the Incidents. The Survey asked participants a series of questions about what they witnessed and experienced, how their health and property were affected, and what actions they believed should be taken going forward. Although Bennington published an article about the Survey and released a spreadsheet reporting the results, it provided only a top-level, macro view of the Survey data. Bennington did not release the full set of data obtained from the individual survey responses. Through the Subpoena and this Motion, LBT seeks to learn the names and addresses of Survey participants.

As explained herein, because there is no sustainable basis for Bennington to refuse to disclose the names and – more importantly – addresses of Survey participants, LBT respectfully requests that the Court enter an Order compelling Bennington to fully and properly disclose this information by producing unredacted individual responses to the Survey in response to the Subpoena within fourteen (14) days of the Court's Order.

## FACTUAL BACKGROUND

### A. The Incidents

The Refinery in St. Croix resumed operations in February 2021 after a period of dormancy. The plaintiffs in the Related Action ("**Plaintiffs**") allege that shortly thereafter, the four Incidents released oil and noxious chemicals, including hydrogen sulfide and sulfur dioxide, into the surrounding environment. They claim these releases spread onto nearby properties, contaminated

the air and water supplies, and caused physical damage, health problems, and disruptions to daily life. In particular, Plaintiffs allege that the Incidents tainted residential cisterns used to collect rainwater for household use. They seek to certify a class consisting of thousands – potentially tens of thousands – of St. Croix residents and others who were allegedly impacted by the Incidents.

### B.  Sedgwick

Following the final Incident in May of 2021, Sedgwick Claims Management Services ("**Sedgwick**") was retained to conduct property inspections and community outreach regarding any potential impact from the final Incident. Between May and July 2021, Sedgwick adjusters visually inspected approximately 2,400 properties. These inspections involved no sampling or testing; instead, Sedgwick relied solely on visual observations to determine whether a property was impacted and to inform settlement offers. Not every home in every estate (neighborhood) was inspected, and some estates were not inspected at all. Thus, Sedgwick's inspections were not estate-based; they were individual-resident based. There is testimony that Sedgwick considered a home or surface to have "impact" if the adjuster saw "any speck whatsoever." Sedgwick's data has played, and will continue to play, a significant role in this litigation.

### C.  The Survey

From June 17 to July 11, 2021, Bennington professor David Bond oversaw the Survey of St. Croix residents about the impacts of the final Incident.[2] The Survey asked participants a series of questions about what they witnessed and experienced, if and how their health and property were affected, and what actions they believed should be taken going forward. Responses to the Survey's

---

[2] The published article (the "**Survey Article**") regarding the study, "Environmental Justice Begins in St Croix," is at https://www.bennington.edu/center-advancement-of-public-action/environment-and-public-action/environmental-justice-begins-st (last visited on August 1, 2025).

26 questions were collected "by going door-to-door, standing outside grocery stores and community centers and encouraging online participation." *Id.* Over its three-week run, the Survey "generated 681 unique responses from 120 different neighborhoods across St. Croix." *Id.* The participants' responses were compiled and published in an 11-page spreadsheet (the "**Spreadsheet**," a copy of which is attached hereto as Attachment 2).

The Spreadsheet reflects significant variation in how residents (many, if not all of whom are likely putative class members in the Related Action) reported being affected by the Incidents – if they reported any impact at all. While some responses describe alleged effects on health or property, the type and extent of those impacts varied significantly from one respondent to another. The responses also differ as to which specific Incident was believed to have caused the alleged harm and how frequently residents were affected. This diversity in the Survey's data underscores that any alleged impact from the Incidents was highly individualized – in type, period, frequency, and degree – and cannot be presumed to be uniform across the proposed class at issue in this litigation. The Spreadsheet does not, however, contain the names or addresses of the Survey's participants; it identifies them only by "Town" and "Neighborhood."

## RELEVANT PROCEDURAL HISTORY

### A. The Related Action

Following the Incidents, four class action lawsuits were filed against LBT and other defendants. These actions were subsequently consolidated into the Related Action.

On June 11, 2024, the District Court entered an Order setting forth the Related Action's discovery schedule. That schedule has since been extended, and fact discovery is now set to close on October 17, 2025. LBT's deadline to file its Rule 26 expert reports is also October 17, 2025.

The Related Action has not yet been certified as a class action. Plaintiffs are asking the

district court to certify a class consisting of individuals who meet the following definition (the "**Class Definition**"):

> All persons or entities: (a) who owed or rented property (real and/or personal) in the Affected Geographic Area on or after February 3, 2021; or (b) who resided in, worked in, operated a business in, or were present in the Affected Geographic Area, or were present in the Affected Geographic Area during the time period from February 3, 2021 to May 6, 2021.

Plaintiffs define the "Affected Geographic Area" as "the western portion of the Island of St. Croix, more particularly described as bounded by 64.74 degrees West Longitude and the sea. [Plaintiffs' Consolidated Second Amended Class Action Complaint (Doc. 1327), filed in the Related Action on August 4, 2025, at ¶ 205.] The broad Class Definition seeks to include over two-thirds of the residents on the Island, which is thousands of individuals.

### B. The Bennington Subpoena

LBT served the Subpoena on Bennington on or about January 21, 2025, seeking documents, data, and communications related to the Survey, including the underlying Survey responses. The Subpoena permitted production by email, mail, or delivery to counsel's office. It did *not* require a personal appearance by Bennington.

Following an ongoing effort to obtain compliance with the Subpoena, Bennington's outside counsel formally responded to the Subpoena on July 18, 2025 (the "**Objection**"). A copy of the Objection is attached hereto as Attachment 3. In its Objection, Bennington objected to Request Nos. 1, 3, 9, 12-14, 16, 17, and 19, and Bennington agreed to produce only limited, non-confidential documents for Requests Nos. 2, 4 through 8, 10, and 11. Among the information that Bennington specifically refused to produce is "identifiable information of the St. Croix residents who participated in the Survey," (Objection, at 2), which Bennington's counsel has declared to be

confidential and which includes the names and addresses of the Survey participants (the "**Identifying Information**").[3]

To date, Bennington has not produced a single document in response to the Subpoena.

### C. LBT's Good Faith Efforts to Resolve the Discovery Dispute

In addition to its pre-Objection efforts to obtain Bennington's compliance with the Subpoena, LBT's counsel replied to the Objection on July 28, 2025 (the "**Reply**," a copy of which is attached hereto as Attachment 4). The Reply substantively addressed Bennington's objections, explaining that its assertions of research and academic privilege were contradicted by applicable legal authority, and proposing an electronic production to mitigate any burden.

Counsel for LBT and Bennington then participated in a Zoom conference on July 30, 2025. During the call, among other topics, LBT's counsel explained why the Identifying Information of was discoverable, as further discussed below. At the conclusion of the conference, Bennington's counsel stated that she would take LBT's position under advisement and consult with Professor Bond.

On August 11, 2025, Bennington's counsel telephonically informed LBT's counsel that Bennington would provide LBT with its document production by the end of August, but she reiterated that Bennington would not voluntarily disclose the Identifying Information. Bennington's counsel subsequently confirmed via email on August 14, 2025 that Bennington would produce the documents requested by the Subpoena, "subject to redaction of the

---

[3] Bennington also initially objected to the Subpoena on the grounds that it required production more than 100 miles from its location and requested that LBT that LBT "reimburse [Professor] Bond at a rate of $250 per hour for his time in collecting responsive documents," (Objection, at 3). Bennington abandoned these objections relatively quickly, however.

names/identities/addresses of the individuals who participated in the Survey."[4] (*See* Email from Bennington's counsel, dated August 14, 2025, a copy of which is attached hereto as Attachment 5.) Moreover, to the extent that Bennington previously objected to producing certain documents, it agreed to "mark[] all documents 'highly confidential' in accordance with the" Confidentiality and Protective Order (the "**CPO**," a copy of which is attached hereto as Attachment 6) entered by the district court in the Related Action to govern the exchange of sensitive materials during discovery. (Exhibit 5, at 1.) Thus, Bennington's remaining objection to the Subpoena is to its disclosure of the Identifying Information through the production of unredacted copies of the individual responses to the Survey or other materials containing Identifying Information.

Accordingly, LBT files this Motion because its experts need the unredacted responses, and especially the addresses contained within the Identifying Information, in connection with the work that they are performing.

## LEGAL AUTHORITY AND ARGUMENT

The requested documents, and Identifying Information contained within them, are highly relevant to LBT's defenses in the Related Action, particularly with respect to class certification issues. They bear directly on the issues of commonality and predominance under Fed. R. Civ. P. 23 – specifically, whether putative class members experienced individualized harm and whether such claims are subject to generalized, non-individualized proof. The documents are also critically relevant to alleged damages claims, including those related to personal injury, medical monitoring, property damage, and environmental harm.

---

[4] Although Bennington has agreed to "provid[e] unredacted survey responses of the named Plaintiffs," (Exhibit 5, at 1), this is insufficient because the other unidentified participants are potential fact witnesses with information or knowledge about the alleged harm (or lack thereof) due to the Incidents.

Although Plaintiffs allege widespread environmental and health impacts across the western half of St. Croix, these effects, if any at all, vary significantly among residents depending on numerous factors such as proximity to the refinery, duration and type of exposure, and individualized health conditions. The Survey data offers unique insight into these variations and is essential for expert analysis of causation, the reliability of Plaintiffs' claims, and the viability of class treatment. Moreover, because Survey participants may be putative class members or fact witnesses, access to the underlying data and responses is critical to preparing LBT's defense, both to oppose class certification and challenge the credibility, scope, and substance of the claims.

## BACKGROUND

Federal Rule of Civil Procedure 45 governs the enforcement of non-party subpoenas. Under it, "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). When such a motion is filed, it must be filed in "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(2)(B)(i). Accordingly, because the Subpoena commands Bennington's compliance within the District of Vermont, this Court is the appropriate forum to adjudicate this motion. *See United States ex rel. Ortiz v. Mount Sinai Hospital*, 169 F. Supp. 3d 538, 543-544 (S.D.N.Y. 2016); *see also JMC Rest. Holdings, LLC v. Pevida*, 2015 WL 2240492, at *3 (E.D.N.Y. 2015) ("the court for the district where compliance is required is the proper venue for a motion to compel").

Courts within the Second Circuit have broad discretion to enforce subpoenas and impose sanctions, including attorneys' fees, for non-compliance. *See Top Jet Enterprises, Ltd. v. Kulowiec*, 2022 WL 280459 (S.D.N.Y. 2022); *see also In re Subpoena to Loeb & Loeb LLP*, 2019 WL 2428704, at *4 (S.D.N.Y. 2019) (trial court has broad discretion to determine whether a subpoena

imposes an undue burden). Courts may compel compliance with a subpoena where the requested discovery is relevant, not privileged, and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1); *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003).

The burden is on the party resisting the Rule 45 subpoena – in this case, Bennington – to demonstrate that compliance would impose an undue burden or that the requested materials are privileged. *See Cris v. Fareri*, NO. 3:10CV1926 RNC, 2011 WL 4433961 (D. Conn. Sept. 22, 2011). A non-party's status does not relieve it of its obligation to comply with a properly issued subpoena. Non-parties, such as Bennington, may be compelled to produce relevant information so long as the subpoena is narrowly tailored and imposes no undue burden. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010).

### A. Bennington Waived Its Right to Object by Failing to Timely Respond to the Subpoena.

Under Rule 45, any written objection to a subpoena for production or inspection, "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). "The failure to serve written objections to a subpoena within the time specified by Rule 45[ ] typically constitutes a waiver of such objections." *Cruz v. Green Tree Mortgage Servicing, LLC*, No. 3:15CV00714 (AWT), 2017 WL 658054 (D. Conn. Feb. 17, 2017) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y. 1996)); *see also Krewson v. City of Quincy,* 120 F.R.D. 6, 7 (D. Mass. 1988) (citing cases from various district courts).

Here, the Subpoena was served on January 21, 2025. Professor Bond did not contact LBT's counsel until March 14, 2025—more than *50* days after service, and to date Bennington has not produced any documents. This delay is well beyond the 14-day deadline set forth in Rule 45 and constitutes a clear waiver of any objections to the Subpoena. Even if the Court were to excuse the

untimeliness, the objections should still be overruled, as they are entirely unsupported by any applicable legal authority.

### B. The Court Should Overrule Bennington's So-Called "Academic Research Privilege" Objection.

Bennington's primary objection appears to be its assertion of a so-called "academic research privilege," based on a single California district court decision from 1976. [Objection, at 1, citing *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.*, 71 F.R.D. 388, 390 (N.D. Cal. 1976)]. This purported privilege is not recognized by the Federal Rules of Evidence and has been consistently declined by Courts in the Second Circuit. *See Smith v. Dow Chemical Co*, 173 F.R.D. 54, 56-57 (1997) (declining to recognize scholar's privilege) (collecting cases); *see also In re Grand Jury Subpoena dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984) (same). Even if the scholars' privilege were recognized in the Second Circuit, which it is not, Bennington could not meet the requisite showing to invoke it. Moreover, any confidentiality concerns related to the disclosure of the Survey's underlying data are fully resolved by the CPO.

### a. The Names and Addresses of the Survey Respondents Are Highly Relevant in the Related Action

While LBT takes Bennington's confidentiality concerns seriously, it cannot evade full compliance with the Subpoena on this basis. Identifying Information at issue – names and addresses – is highly relevant and material to LBT's defenses, including, among other things, the question of class certification and the assessment of alleged damages.

To obtain class certification in the Related Action, Plaintiffs must establish numerosity, commonality, typicality, and adequacy of representation. *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023). In addition, they must satisfy at least one subsection of Rule 23(b); here, Plaintiffs proceed under Rule 23(b)(3), which requires a showing that common questions of law

or fact predominate over individualized ones, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

For the purposes of this motion, LBT focuses on the requirements of commonality and predominance. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022). To establish predominance, "a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.'" *Post v. Killington, Ltd.*, No. 2:07-CV-252, 2008 WL 4615914, at *3 (D. Vt. Oct. 14, 2008) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)). These standards are particularly difficult to satisfy in environmental mass tort cases, where courts have recognized that:

> Mass environmental tort cases seldom satisfy the predominance requirement of Rule 23(b)(3). Typically in these cases, causation and extent of injury must be decided on a property-by-property basis. Those individualized issues tend to be more complex than common issues of the defendant's conduct.

*Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F.Supp.3d 646, 657 (E.D. Pa. 2022).

This is precisely what makes the requested discovery – particularly the Identifying Information – so critical. It directly affects LBT's ability to demonstrate individualized exposure, causation, and harm in opposing class certification. A key issue in this case is whether the Incidents caused contamination to cisterns and properties across the western portion of St. Croix, and whether that contamination resulted in the alleged injuries. The Survey documents bear directly on these issues, including whether any contamination occurred, what was allegedly contaminated, what incident or source is claimed to have caused the contamination, and what, if any, health impacts were experienced as a result. Because the proposed Class Definition is defined by geographic location, the Identifying Information is essential to evaluating whether the alleged

injuries and their causes are truly common, and whether Plaintiffs can establish causation and damages on a class-wide basis.

For example, if LBT obtains the Identifying Information, it can use the Survey responses to create a visual map showing, among other things, the presence or absence of reported impact, the type of impact, and which Incident is claimed to have caused it. This demonstrative is critically important to establishing the wide variation among putative class members and the resulting lack of predominance. For example, the image below illustrates how LBT may present the Survey data to highlight the variation in alleged impact across the Island. (The image is for illustrative purposes only and does not purport to reflect actual data.)



Such evidence can only be developed if LBT obtains the Identifying Information at a micro-level (*i.e.*, specific addresses), as the macro-level information presently available (*i.e.*, estates, neighborhoods, and towns) is far less effective for meaningfully evaluating predominance among the Survey respondents.

        b. <u>Comparing The Survey and Sedgwick Data Is Critical to Evaluating Class Claims</u>

The Survey data is similar to the Sedgwick data, which LBT believes that Plaintiffs will rely upon in their certification efforts. However, unlike the Sedgwick data—which assessed oil-related impacts following only the final Incident—the Survey responses address all four Incidents and reflect the timing, location, and nature of alleged impacts more broadly. Having the Identifying Information would allow LBT to compare the two datasets—confirming if or where they align and

probing inconsistencies where they do not. This comparison is essential to evaluating the credibility of individual claims, determining whether injuries are common or individualized, and assessing whether the Survey data supports or undermines the Sedgwick data.

### c. The Names of Survey Respondents May Allow Impeachment of Named Plaintiffs or Other Witnesses

Many, if not all, of the Survey respondents are likely putative class members who may eligible to recover damages and may be called as fact witnesses at the trial of this matter. Moreover, many of the Survey respondents may have had their properties inspected by Sedgwick. Their Survey responses may contain statements or admissions that are relevant to this case, whether for impeachment or other purposes. As such, the requested discovery and disclosure of the Identifying Information is imperative to allow LBT to fairly and adequately defend itself.

### d. The Federal Rules of Evidence Require the Disclosure of the Underlying Survey Response Forms.

The Federal Rules of Evidence require that LBT obtain the individual survey forms in unredacted form. First, to the extent LBT may seek to introduce the Spreadsheet as a business record of Bennington, it must demonstrate its trustworthiness. *See, e.g.*, Fed. R. Evid. 807(a)(1). Similarly, although not directly applicable, Fed. R. Evid. 1006 permits the use of summary documents, but only if the underlying materials are available for review. Accordingly, LBT must have the underlying Survey responses available to demonstrate its trustworthiness or for the other parties' or the district court's review.

**C. The Court Should Overrule Bennington's Confidentiality Objection to Disclosing the Identifying Information Because a Confidentiality Protective Order Is in Place in the Related Action.**

Despite agreeing to produce all documents but the unredacted responses to the Survey pursuant to the CPO as "highly confidential," Bennington continues to refuse to produce materials

that contain Identifying Information. This position is wholly inconsistent. On the one hand, Bennington acknowledges the significant protections that the CPO provides for "highly confidential" materials. On the other, Bennington appears to believe that the CPO is insufficient as to Identifying Information. The Identifying Information is not protected by any recognized privilege and it is directly relevant to the subject litigation, as explained above.

## CONCLUSION

For all the foregoing reasons, Petitioner Limetree Bay Terminals, LLC respectfully requests that the Court enter an order compelling non-party Bennington College to fully comply with and respond to the Subpoena, including producing unredacted copies of all individual Survey responses and other materials that may contain Identifying Information, within fourteen (14) days of the Court's order and granting LBT any such further relief as the Court deems appropriate under the circumstances.

## CERTIFICATION PURSUANT TO LOCAL RULE 7(a)(7)

Pursuant to Local Rule 7(a)(7), the undersigned counsel certify that counsel for LBT made a good faith attempt to obtain the opposing party's agreement to the requested relief, but that such agreement was unable to be obtained.

                                                  Respectfully submitted,

DATED: August 25, 2025    By: *[signature]*

                                    *Local Counsel for Petitioner Limetree Bay Terminals, LLC*

                                  Paul Michienzie
                                  Luks, Santaniello, Petrillo, Cohen & Peterfriend
                                  745 Boylston Street, Suite 501
                                  Boston, MA 02116
                                  Tel: (617) 227-5660
                                  pmichienzie@insurancedefense.net

                                  *Counsel for Petitioner Limetree Bay Terminals, LLC*

                                  Jennifer Adler, Georgia Bar No. 585635
                                  Christopher Garten, Georgia Bar No. 685511
                                  *To be admitted pro hac vice in this matter.*
                                  Weinberg Wheeler Hudgins Gunn & Dial LLC
                                  3344 Peachtree Road NE
                                  Suite 2400
                                  Atlanta, Georgia 30326
                                  t. 404.876.2700
                                  f. 404.875.9433
                                  Jadler@wwhgd.com
                                  cgarten@wwhgd.com